1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF ARKANSAS
 2                        CENTRAL DIVISION

 3   IN RE:                        .
                                   .  Case No. 4:24-BK-11566
 4   SQRL HOLDINGS LLC,            .
                                   .  Fayetteville, Arkansas
 5   ALLEGED DEBTOR.               .  October 10, 2024
      . . . . . . . . . . . . . .  .  9:25 A.M.
 6

 7

 8

 9                          TRANSCRIPT OF

10                   THE COURT'S ORAL RULING

11        REGARDING HEARING ON INVOLUNTARY PETITION

12                  HELD ON AUGUST 23, 2024

13           BEFORE THE HONORABLE BIANCA M. RUCKER

14              UNITED STATES BANKRUPTCY JUDGE

15

16

17

18   ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Angie Squires-Carter

19

20   Transcription Service:           Robin Warbritton
                                      P.O. Box 262
21                                    Vilonia, AR  72173
                                      (501) 796-6560
22

23

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

2

```
1   APPEARANCES:

2   For the Alleged Debtor:        Mr. Clinton W. Lancaster
     (SQRL Holdings LLC)            Lancaster & Lancaster
3                                   Law Firm, PLLC
                                    P.O. Box 1295
4                                   Benton, AR  72018

5   For the Petitioning Creditor:  Mr. J. Brian Ferguson
     (Gas POS, Inc.)                Ferguson Law Firm, PLLC
6                                   3333 Pinnacle Hills Parkway
                                    Ste. 410
7                                   Rogers, AR  72758

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

P R O C E E D I N G S

1

2    (Call to order of the Court.)

3        THE COURT:  Okay.  We are here in the case of *SQRL*

4  *Holdings LLC*.  This is case number 4:24-11566.

5        We have some parties that are on the phone listening.

6  I will not ask for their appearance.  They are just listening.

7        But I would like appearances in this case, at this

8  time, before I rule.

9        MR. FERGUSON:  Your Honor, Brian Ferguson, attorney

10  for Gas POS, Inc., the petitioning creditor.

11        MR. LANCASTER:  And I'm Clint Lancaster.  I represent

12  SQRL Holdings.

13        THE COURT:  Okay.  Thank you both.

14        Okay.  I'm going to go through some of the procedural

15  history of this case, tell you my ruling, and then tell you

16  why.

17        Before the Court is the involuntary petition of SQRL

18  Holdings LLC, which I'll refer to as SQRL, filed on May 13th,

19  2024.  The petition was originally filed by three petitioning

20  creditors; Gas Hub Investments LLC, K&A Endeavors LLC, and MT

21  Everest Investment LLC.  On June 10th, a fourth petitioning

22  creditor, Gas POS, joined by filing a notice pursuant to

23  Section 303(c).

24        The Court held a pretrial conference on June 12th.

25  At that hearing, based on the schedules of the parties, it was

1    determined that the trial under Section 303 would be set on

2    July 29th.  Subsequently, discovery disputes arose.  On July

3    17th, the Court held an emergency hearing at which the parties

4    were put on an expedited discovery schedule.  And,

5    subsequently, the trial under Section 303 was continued to

6    August 22nd to allow for such discovery.

7           Prior to the trial, on July 15th, the alleged debtor

8    and three petitioning creditors filed a joint motion

9    requesting that three -- that these three original petitioning

10   creditors be allowed to withdraw.  The Court scheduled a

11   hearing --

12        (Another listener joined the conference on the telephone.)

13           THE COURT:  Okay.  The Court scheduled a hearing on

14   July 29th, and with the consent of the remaining petitioning

15   creditor, Gas POS, the Court allowed withdrawal, but, per

16   Federal Rule of Bankruptcy Procedure 1003(b), the Court was

17   required to allow enough notice for others to join.  Because

18   the alleged debtor had never filed a list of creditors, per

19   Rule 1003, the Court requested that counsel for the alleged

20   debtor do so.  The list was filed on July 31st, and on that

21   same date the Court issued a notice to creditors of their

22   ability to join, and the trial was continued to August 22nd at

23   1:30.

24           On the morning of August 22nd, the Court was notified

25   that due to separate emergencies, neither party's principal

1  could attend at 1:30, and the Court continued the hearing to

2  the next day, to begin at 9:00 a.m., on which date the hearing

3  under Section 303 was held.

4         At that hearing, no additional creditors joined as

5  petitioning creditors before or during the hearing.  Gas POS,

6  which I will refer to as GP, proceeded as a single creditor

7  under Section 303(b)(2).

8         Based on the evidence and testimony presented at the

9  hearing on August 23rd, and for the reasons I will state, the

10  Court declines to enter an order for relief and dismisses the

11  case.

12         First, turning to the issue before the Court and the

13  burden of proof.  The issue is whether the petitioning

14  creditor, GP, met its burden under Section 303 by a

15  preponderance of the evidence so that this Court must enter an

16  order for relief.  And that is from *In re Kennedy*, 504 B.R.

17  815, a bankruptcy case out of the Southern District of

18  Mississippi, 2014; see also *In re Everett*, 178 B.R. 132.

19         Once met, the burden then shifts to the alleged

20  debtor.  *In re C & C Jewelry*, 2001 WL 36340326, and also *In re*

21  *A & J Quality Diamonds*, 377 B.R. 460.

22         Regarding the applicable law, Section 303 of Title 11

23  controls the outcome of this case.  Some matters under Section

24  303 were not disputed.  There was no dispute that the petition

25  was timely controverted under Section 303 by the alleged

6

1  debtor on June 3rd, 2024.  There was also no dispute at trial

2  that SQRL qualifies as a person under Section 101(41) and does

3  not fall within the enumerated exceptions of Section 303(a).

4  And other than the remaining analysis under Section 303, there

5  is no reason why it could not otherwise be a debtor under

6  Chapter 7.

7       Lastly, while the alleged debtor requested a bond

8  under Section 303(e) in its answer, at a pretrial conference

9  on June 12th counsel stated it was no longer seeking a bond.

10      Subsections (b) and the remaining parts of (h) remain

11  at issue.  Specifically, subsection (b) sets out who may

12  commence an involuntary case.  GP stated at trial that it was

13  proceeding under (b)(2), which states, in relevant part only,

14  that if there are fewer then 12 holders of a claim against the

15  alleged debtor that are not contingent as to liability or the

16  subject of a bona fide dispute as to liability or amount, and

17  excluding any employee or insider of such person and any

18  transferee of a transfer that is voidable under several

19  sections -- and, for the record, GP is alleged to be none of

20  these -- then the case may be commenced by just one holder of

21  a claim of at least 18,600 dollars if that claim is not

22  contingent nor the subject of a bona fide dispute as to

23  liability or amount.

24      The alleged debtor does not dispute that there are

25  fewer than 12 holders of the types of claims described in

1   Section 303(b).  In fact, its position is that it has no such

2   creditors, that all of its alleged creditors hold claims that

3   are the subject of a bona fide dispute and/or contingent,

4   including that of GP.  See GP Exhibit 19, page 7 of 13,

5   Requests for Admissions 1 through 6 with responses.

6        Specifically, in its discovery responses, the alleged

7   debtor stated that it was the subject of lawsuits around the

8   nation, as a guarantor in many cases, and in some cases the

9   debts being sued on were assumed by Gas Hub Investments LLC,

10  which I'll refer to as Gas Hub, when SQRL, the alleged debtor,

11  sold SQRL Service Stations LLC, a separate entity, to Gas Hub

12  in April 2024.

13       The alleged debtor stated that other cases involved

14  preemptive breaches of contract.  In any event, the alleged

15  debtor disputed that it owed any creditors and disputed any

16  amounts asserted by them.

17       Additionally, under (h)(1), GP must prove that the

18  alleged debtor is generally not paying its debts as they

19  become due, unless such debts are the subject of a bona fide

20  dispute as to liability or amount.

21       GP asserted that two creditors, GP and Today's Bank,

22  held claims that were not in bona fide dispute and were not

23  being paid by the alleged debtor as of the petition date.

24       Today's Bank is not a petitioning creditor.  Again,

25  SQRL's defense is that it has no debts that are not the

8

1    subject of a bona fide dispute as to liability or amount for

2    the reasons already mentioned.

3          I want to go further into the Court's analysis.  The

4    first issue that I've referred to is whether GP holds a claim

5    greater than 18,600 dollars that is neither contingent nor in

6    bona fide dispute as to liability or amount.  A claim is

7    defined, in relevant part, by Section 1015(a), as a right to

8    payment, quote:

9                "Whether or not such right is

10               reduced to judgment, liquidated,

11               unliquidated, fixed, contingent,

12               matured, unmatured, disputed,

13               undisputed, legal, equitable,

14               secured, or unsecured."

15         And there is no dispute that GP holds a claim against

16   SQRL.  The question is whether that claim is either contingent

17   or subject to a bona fide dispute as to liability or amount.

18         The Court notes that in GP Exhibit 19, the alleged

19   debtor contended its payment obligations to GP are contingent.

20   However, at trial, the parties did not focus on whether the

21   subject claim was contingent, but, instead, focused on proving

22   whether the claim was subject to a bona fide dispute.  A bona

23   fide dispute is not defined by the Bankruptcy Code, which,

24   quote:

25               "Thereby leaves the term's meaning

9

1           to judicial determination, i.e.,

2           to judicial construction."

3      End quote.  That's *In re American Res. & Energy LLC*,

4  513 B.R. 371, citing *In re Rimell*, 946 F.2d 1363, an Eighth

5  Circuit case from 1991.  The Eighth Circuit in *In re Rimell*

6  categorizes the, quote:

7           "Determination as to whether a

8           dispute is bona fide," end quote,

9           as a factual finding.

10          "The standard is objective."

11     End quote.

12          "Neither the debtor's subjective

13          intent, nor the debtor's

14          subjective belief, is sufficient

15          to meet this burden."

16     End quote.  That's, again, *In re Rimell* at 1365.

17     Again, also from the *Rimell* case:

18          "The Court's objective is to

19          ascertain whether a dispute that

20          is bona fide exists.  The Court is

21          not to actually resolve the

22          dispute."

23     That's at 1365 as well, the *In re Rimell* case.

24     This, quote:

25          "Does not mean that the bankruptcy

1    court is totally prohibited from

2    addressing the legal merits of the

3    alleged dispute; indeed, the

4    bankruptcy court may be required

5    to conduct a limited analysis of

6    the legal issues in order to

7    ascertain whether an objective

8    legal basis for the dispute

9    exists."

10    Again, *In re Rimell*, 946 F.2d 1363, citing *Matter of*

11 *Busick*, 831 F.2d 745.

12    "The Court should consider

13    relevant factors, including the

14    posture of the parties, the nature

15    and gravity of the parties'

16    contentions with each other, the

17    factual and legal backdrop of --

18    the factual and legal contentions

19    that the parties have with each

20    other, and the backdrop non-

21    bankruptcy law that governs their

22    dispute."

23    That's from *In re American Res. & Energy LLC*, 513

24 B.R. at 382.

25    Further, quote:

1                "The determination as to whether a

2                dispute is bona fide will often

3                depend upon an assessment of

4                witnesses' credibilities and other

5                factual considerations."

6      Also *In re American Res. & Energy LLC* at 383, quoting

7 the *Rimell* case.

8      So, turning to the first relevant factor, the posture

9 of the parties.  The relationship between GP and SQRL is

10 contractual, and this business relationship is controlled by

11 three main documents.  First, a Merchant Application and

12 Master Agreement, an MAA, including two addendums; a Program

13 Guide, that describes the terms under which GP was to -- was

14 to provide merchant processing services to SQRL and contains

15 an Equipment Lease Agreement; and an End User License

16 Agreement.

17      At the hearing, each party alleged a breach of the

18 terms of one or more of these documents and/or a failure to

19 perform under them.

20      Ben Kauder, the Chief Operating Officer for

21 petitioning creditor GP, testified at trial on behalf of GP.

22 Joseph Blake Smith, founder and CEO of SQRL, testified for the

23 alleged debtor.  Each witness appeared, based on the Court's

24 record before it and its observation of the witnesses that

25 day, to testify credibly, based on, again, the Court's

1   observance of the manner and substance of their testimony.

2   While they certainly disagreed with each other, they both

3   answered questions asked of them on direct and cross, and, for

4   the most part, did not equivocate.  And, in any event, neither

5   witness equivocated enough to affect the Court's finding that

6   they were both credible.

7           Regarding the nature and gravity of the allegations,

8   Kauder testified that SQRL defaulted by -- by failing to make

9   payments pursuant to the MAA for the lease of certain

10  equipment, including a PAG, P-A-G, and POS systems, and also

11  by failing to provide a letter of credit upon GP's request,

12  per the Program Guide, page 20, section 25, the Reserve

13  Account Security Interest section.

14          Smith did not contest that SQRL had not paid all

15  amounts due under the contract and did not address in any

16  detail the allegation that SQRL failed to provide a letter of

17  credit.

18          Smith, or his attorney, essentially raised three

19  reasons why SQRL was excused, in whole or in part, from

20  performing under the contract; first, a failure to provide 225

21  C-PAGs; second, a failure to install two PAGS; and because --

22  and third, because GP's POS systems malfunctioned and caused

23  lost income.

24          Although GP and SQRL each have complaints about the

25  other's performance under their agreement, the initial burden

1  rests on GP, as the petitioning creditor, to first establish a

2  *prima facie* case that no bona fide dispute exists.  That's,

3  again, *In re Rimell*, 946 F.2d at 1365.

4       If GP successfully establishes a *prima facie* case,

5  then the burden shifts to the alleged debtor to present

6  evidence that a bona fide dispute does not exist based upon an

7  objective standard.  Also *In re Rimell*.

8       GP's claim is based on SQRL's alleged breach of

9  contract.  To prove breach of contract under Alabama law,

10 which is the controlling law pursuant to Section 1.15 of the

11 Equipment Lease Agreement in the Program Guide, GP Exhibit

12 12C, GP must establish the following elements:

13       First, a valid contract binding the parties.

14       Second, GP's performance under the contract.

15       Third, SQRL's nonperformance.

16       And fourth, resulting damages.

17       That's *Cook's Pest Control, Inc. v. Rabar*, 28 So. 3d

18 716, a 2009 Alabama case, citing *Reynolds Metal Co. v. Hill*,

19 825 So. 2d 100.

20       The Court finds that GP established the first, third,

21 and fourth elements by demonstrating the existence of a valid

22 contract that bound both parties, showing SQRL's

23 nonperformance and damages.  However, to determine whether GP

24 established that it performed under the contract, which is the

25 second element of a breach of contract claim, the Court must

14

1   examine what was required of GP under the contract and whether

2   GP performed those obligations.  Although there are

3   undoubtedly additional terms that GP agreed to perform under

4   the parties' contract, the Court will only discuss the

5   material terms upon which the parties focused at the hearing.

6          So, first, with regard to the C-PAGs, the contract

7   stated in the summary of terms, GP Exhibit 12A, that GP would

8   install 225 C-PAGs at SQRL locations.  GP's witness, Mr.

9   Kauder, described a C-PAG as an entire convenience store that

10  is dropped off, similar to a mobile home, where customers can

11  buy things inside.  GP concedes that it did not provide or

12  install any C-PAGs.  However, GP's obligation to install

13  C-PAGs was never triggered under the contract because --

14  because the summary of terms, contained in GP Exhibit 12A,

15  stated that SQRL would first provide GP the location for each

16  C-PAG, and within ten days of the location being provided to

17  GP, SQRL would pay GP a three month deposit totaling 24,000

18  dollars, which did not occur.  SQRL put on no evidence to the

19  contrary; therefore, the C-PAGs are a nonissue in determining

20  GP's performance under the contract.

21         Second, the Point of Sale or POS equipment.

22  According to Kauder, this is, quote:

23              "Software that runs the ability of

24              tracking inventory on the inside

25              of the store."

1       End quote.  It also has a hardware component.

2       There was no evidence introduced at trial that GP

3  failed to provide the POS equipment according to the terms of

4  the contract.  According to Smith, SQRL's nonpayment of the

5  amount due for this equipment was due to the performance of

6  the equipment.  Smith testified that GP's POS systems did not

7  always work reliably at the pumps.  He stated that in some

8  locations they were using independent credit card processing

9  machines on the inside -- or on the side, such as Toast or

10  Square, on an emergency basis, and that there was a period of

11  time when the SQRL stores could not sell products unless

12  customers paid in cash.  He also testified that he believes

13  SQRL lost money because of the malfunctioning equipment, and

14  that people working for him had reported these problems to GP.

15  Smith did not believe the equipment performed how it was

16  supposed to perform under the contract.

17       GP's response was that malfunctioning equipment was

18  not an excuse to not pay the lease payments, citing Section

19  1.4 of the Equipment Lease Agreement in the Program Guide, GP

20  Exhibit 12C, which states that, quote:

21              "Lease payments will be due

22              despite dissatisfaction with the

23              equipment for any reason."

24       End quote.  Therefore, regardless of whether the

25  equipment malfunctioned, it appears that GP did fulfill this

16

1  term of the contract for purposes of determining GP's

2  performance, particularly, in light of certain other

3  provisions in the contract.  For instance, Section 1.1 of the

4  Equipment Lease Agreement, that states GP provides the

5  equipment, quote:

6           "As is."

7        And Section 1.10, which provides that all warranties

8  are disclaimed.

9        There is also a disclaimer of warranties in Section

10  5.1 of the End User License Agreement, Managed Services

11  Agreement, GP Exhibit 12B, that similarly provides that GP

12  makes no warranties in regard to performance of the services.

13        Kauder, on the stand, appeared at one point to assert

14  that GP had no obligation under the contract to provide

15  working systems, but conceded on cross that some level of

16  performance by GP was expected.

17        Kauder testified that there was no way to measure

18  GP's performance or calculate damages under the contract.

19  However, some measure of damages is, in fact, contemplated by

20  the contract.  Section 1.9 of the Equipment Lease Agreement in

21  the Program Guide provides that GP's liability arising out of

22  or in any way connected with this lease agreement shall not

23  exceed the aggregate lease amount paid to GP for the

24  particular equipment involved.  Similarly, Section 5.2 of the

25  EULA provides that damages shall not exceed the aggregate fees

1   paid by customer under this agreement during the 12 months

2   immediately prior to the incident underlying GP's liability.

3   These provisions offer some basis for SQRL to potentially

4   offset some amount of what it owes to GP.  In any event, these

5   provisions go to determining the amount of any debt owed by

6   SQRL to GP, not to whether GP put on a *prima facie* case that

7   it performed under the contract regarding its obligation to

8   provide POS equipment and services under the agreement, which

9   GP appears to have done.

10          The third is -- or relates to the PAGS, which are --

11   that's P-A-G-S.  They are portable above ground fuel tanks

12   that contain dispensers and point of sale systems.  According

13   to Kauder, GP received orders from SQRL for two PAGS.  The

14   evidence the Court heard at trial related only to the PAG at

15   the Paron, Arkansas location.  The MAA for the Paron location

16   was introduced as GP Exhibit 12D, and it provided for a 120

17   month lease of the PAG, at 4,708 dollars per month.  Under the

18   boilerplate terms of the Equipment Lease Agreement in the

19   Program Guide, GP Exhibit 12C, payments under the lease

20   agreement would have started on the date GP delivered any

21   piece of equipment to SQRL.  However, SQRL specifically

22   negotiated a change to the standard term, as evidenced by the

23   addendum introduced as GP Exhibit 12A, and confirmed by

24   Kauder's testimony about the changed term, which was offered

25   as proof that SQRL had equal bargaining power.

1      According to the addendum, which controls in the

2   event it conflicts with another part of the agreement, quote:

3              "Regardless of the timing of

4              installation, customer agrees that

5              the 120 month term shall begin

6              with regard to each location upon

7              installation."

8      End quote.  GP, through Kauder, admitted that it did

9   not install the PAG at the Paron location.  Although the term

10  "install" was not defined in the contract, GP did not argue at

11  trial that the term "install" was ambiguous.  In fact, GP

12  acknowledged, through Kauder's testimony, that there is a

13  difference between installation and delivery.  And there is.

14  According to the Oxford Dictionary, "deliver" means:

15             "To bring and hand over."

16     And "install" means:

17             "To place or fix equipment or

18             machinery in position for ready

19             use."

20     That there is a difference between the two terms is

21  implicit in the language of the agreement as well.  For

22  instance, Section 1.4 of the Equipment Lease Agreement states

23  that SQRL agreed to pay all assessed costs for delivery and

24  installation of the equipment.  Further, the difference

25  between delivery and installation is evidenced by the need for

19

1  an addendum to change the event triggering the lease term from

2  delivery, which was the boilerplate language, to installation.

3          Although Kauder acknowledged that delivery and

4  installation are different, he testified that the meaning of

5  installation changed to delivery per verbal instructions from

6  SQRL.  Kauder's testimony about this verbal instruction was

7  far from definitive.  Kauder first said Adam L. told him GP

8  only had to deliver the PAG, but Kauder could not say if Adam

9  L. was Adam Lusthaus, a co-owner of SQRL.  During his

10  testimony, Kauder asked to look at his phone, and after doing

11  so, testified that the instruction came from Justin Cree of

12  Cree Engineering.  Blake Smith testified that he did not give

13  the instruction, nor was he aware of it.  Regardless,

14  according to the language of the contract itself, specifically

15  Section 1.17 of the Equipment Lease Agreement in the Program

16  Guide, changes cannot be made to the agreement unless they are

17  in writing and signed by all parties.  Based on the language

18  of the agreement itself, GP failed to show that a verbal

19  instruction, which purported to change a material and

20  specifically negotiated contract term, was a valid change to

21  the contract that excused GP's obligation to install.

22          Because GP admits that it did not install the PAG at

23  the Paron location, the Court cannot find that GP performed

24  under the contract in this regard.  Therefore, the Court finds

25  that GP failed to carry its threshold burden of establishing a

20

1  *prima facie* case that the debt is not in bona fide dispute,

2  because, among other things, GP did not establish its own

3  performance under the contract as to the Paron PAG.

4          Because GP failed to prove that it performed at least

5  one material obligation in the contract, the Court finds that

6  SQRL's liability to GP is in bona fide dispute.

7          In addition, the Court finds that the amount of the

8  debt SQRL owes to GP is in bona fide dispute based on Smith's

9  testimony that the POS equipment malfunctioned and resulted in

10  lost business.

11         While the contract attempts to limit GP's liability

12  under such circumstances, it does not completely absolve GP

13  from owing damages stemming from problems with the equipment.

14         Also, keep in mind, the admission by Smith that he

15  has not made payments does not mean there is not a bona fide

16  dispute.  In *In re American Resource & Energy LLC*, 513 B.R.

17  371, the court stated that, quote:

18                  "While putative -- while putative

19                  debtor did not deny that it had

20                  failed to pay for invoiced

21                  shipments of goods received from

22                  petitioning creditor, this did not

23                  mean that creditor's breach of

24                  contract claim was not subject to

25                  bona fide dispute."

1    Here, GP has alleged SQRL defaulted by not paying the

2 amounts due under the contract, and SQRL has asserted

3 colorable affirmative defenses to payment.

4    "When a party raises a defense to

5    a breach of contract claim, and

6    the defense involves an issue of

7    fact, normally, a trial must be

8    held on the defense."

9    That is from *LNM1, LLC v. TP Props*, 296 So. 3d 792;

10 see also *Lem Harris Rainwater Family Trust v. Rainwater*, 373

11 So. 3d 1089.

12    "In the context of an involuntary

13    petition, if there is a genuine

14    issue of material fact that bears

15    upon the debtor's liability or

16    amount of the claim, then the

17    petition must be dismissed."

18    *In re Lough*, 57 B.R. 993; see also *In re Busick*, 831

19 F.2d 745.  And that *In re Busick* case states:

20    "If there is a bona fide dispute

21    as to either the law or the facts,

22    then the creditor does not qualify

23    and the petition must be

24    dismissed."

25    See also *In re Vortex Fishing Systems, Inc.*, 277 F.3d

22

1    1057.

2         In other words, the Court would essentially have to

3    find that GP is entitled to summary judgment in order to enter

4    an order for relief here.  See *In re C & C Jewelry*, *Inc.*, 2001

5    WL 36340326, a Ninth Circuit BAP case.

6         For the foregoing reasons, the Court finds that there

7    is a bona fide dispute as to both liability and amount of

8    SQRL's debt to GP on account of the Paron PAG and the

9    potential offsets that SQRL could be entitled to for the

10   malfunctioning POS equipment.

11        The Court -- the Court has an opinion as to how these

12   bona fide disputes might play out, but the evidence the

13   parties presented was in relation to proving their positions

14   under Section 303.  And the parties were not under an

15   obligation to bring the entire case and the entire defenses to

16   this hearing on August 23rd.  That record, which would play

17   out in a different forum, could look a lot different.

18        The Court's job was not to decide the outcome, but to

19   decide whether there is a bona fide dispute; and there is, for

20   the reasons I have stated.

21        The Court believes this ruling also comports with the

22   intent of the Bankruptcy Code in providing for involuntary

23   petitions.  GP is not the kind of creditor that Section 303

24   contemplates.

25              "The requirement that a creditor's

23

1          claim not be the subject of a bona

2          fide dispute is intended to

3          prevent creditors from using the

4          bankruptcy process as a means of

5          coercing alleged debtors to pay

6          legitimately disputed debts."

7     See *Chicago Title Insurance Company*, 156 F.3d 1005;

8 also, *In re Mountain Dairies, Inc.*, 372 B.R. 623, which states

9 that:

10          "Courts are wary of encouraging

11          parties to use the bankruptcy

12          system as a quick resolution to

13          their money disputes."

14     Also, *In re Tobacco Road Associates*, 2007 WL 966507,

15 stating:

16          "The bankruptcy court is not the

17          correct venue for adjudicating

18          disputes about whether a debt is

19          owed."

20     In many ways the arguments between GP and SQRL

21 presented a two-party dispute.  Here, we have unresolved

22 claims and arguments as to liability and amount; we have a

23 back and forth that is indicative of a real dispute; no party

24 holds a judgment against the other for these claims, and, in

25 fact, no litigation has been filed regarding any of these

1   allegations by any party outside this court.

2        There are unanswered questions that bear on whether

3   SQRL's defenses to payment will ultimately succeed, but this

4   Court's query ends before that point.

5        Suffice it to say, after reviewing applicable law and

6   evidence and testimony in the Court's record, the Court finds

7   that the GP -- that the debt of GP is subject to a bona fide

8   dispute as to liability and amount.

9        Finally, I will address that despite there being

10  multiple SQRL locations, there was only one agreement between

11  SQRL and GP, as evidenced by the summary of terms on the

12  confirmation page of GP Exhibit 12A, which states that the

13  agreement, quote:

14            "Shall apply to all existing

15            locations, as well as any

16            locations that are added after the

17            signing of this acknowledgment."

18       End quote.  Based on the single agreement between the

19  parties, GP holds only one claim against SQRL, rather than

20  multiple claims that might have been -- that might have

21  furnished separate bases for evaluating whether GP held at

22  least one claim of 18,600 dollars or more that was not in bona

23  fide dispute.

24       Quote:

25            "Courts are split as to whether a

1     dispute as to any portion of a

2     claim, even if some dollar amount

3     would be left undisputed, means

4     that there is a bona fide dispute

5     as to the amount of the claim."

6   End quote.  That's from *In re TV Azteca*, *S.A.B. de*

7 *C.V.*, 2023 WL 8059362.  It's a bankruptcy case out of the

8 Southern District of New York in 2023, quoting *In re Koffee*

9 *Kup Bakery, Inc.*, 2022 WL 141516; see also *Montana Department*

10 *of Revenue v. Blixseth*, 942 F.3d 1179, a Ninth Circuit case,

11 and that case collects cases.

12   While the Eighth Circuit has not addressed the issue,

13 quote:

14     "The only three circuit courts

15     that have decided the issue, the

16     First, Fifth, and Ninth, have

17     concluded that a creditor whose

18     claim is the subject of a bona

19     fide dispute as to liability or

20     amount lacks standing to be a

21     petitioning creditor under Section

22     303(b)(1) even if a portion of

23     their claim amount is undisputed."

24   End quote.  That's *In re TV Azteca*, 2023 WL 8059362.

25   In addition, most lower courts, quote:

1       "Have held that as a result of the

2       2005 amendment to Section 303(b),

3       any dispute regarding the amount

4       of the petitioning creditor's

5       claims that arises from the same

6       transaction, and is part of the

7       underlying claim, renders the

8       claim subject to a bona fide

9       dispute."

10      End quote.  That is from *In re TV Azteca*, as well,

11      quoting *In re Rosenberg*, 414 B.R. 826, and *In re Euro-American*

12      *Lodging Corp.*, 357 B.R. 700.

13      This Court agrees with the prevailing interpretation

14      of Section 303(b), because, quote:

15      "Involuntary bankruptcy is a

16      particularly severe remedy,

17      Congress limited the circumstances

18      in which creditors may force a

19      debtor into such a proceeding, and

20      an uncontested portion of a claim

21      is not enough to save eligibility

22      if another portion of that same

23      claim is contested."

24      End quote.  That's *In re ArtiusID, Inc.*, 2024 WL

25      3517625, a bankruptcy case out of the Western District of

1   Texas, July 2024.

2          Although the Court cannot enter an order for relief

3   because the sole petitioning creditor holds a claim that is in

4   bona fide dispute as to liability and amount, the Court will

5   nonetheless address whether GP carried its burden under

6   Section 303(h)(1), which, again, was whether the debtor is

7   generally not paying debts as they become due and those debts

8   are not in bona fide dispute as to liability or amount.

9                   "A petitioning creditor must prove

10                  under Section 303(h)(1) that the

11                  debtor is generally not paying

12                  such debtor's debts as they become

13                  due."

14          That is from *In re Murrin*, 477 B.R. 99.

15                  "The generally not paying

16                  requirement helps to further the

17                  purpose of involuntary bankruptcy

18                  by protecting the interests and

19                  desires of the creditors as a

20                  whole."

21          That is also from *In re Murrin*, a quote from *In re*

22   *Murrin*, citing *Crum and Forster Managers Corp. of New York*,

23   911 F.2d 155.

24                  "Involuntary bankruptcy is not to

25                  be used as a forum for the trial

1          and collection of an isolated

2          dispute -- of an isolated disputed

3          claim, a practice condemned in

4          prior decisions."

5     *In re Murrin*, 477 B.R. at 106, citing *Saunders*, 379

6  B.R. at 857, and *In re Nordbrock*, 772 F.2d 397.

7          "'Generally' is not specifically

8          defined in the Bankruptcy Code.

9          Most courts use a totality of the

10         circumstances test to determine

11         whether a debtor is generally not

12         paying their debts."

13    *In re Murrin*, 477 B.R. 106.

14    Although courts consider the totality of the

15 circumstances in making this determination, in *In re Feinberg*,

16 an Eighth Circuit BAP case from 1999, found at 238 B.R. 781,

17 the panel cited factors to consider.

18    First:

19         "The number of unpaid claims."

20    Second:

21         "The amount of the claims."

22    Third:

23         "The materiality of nonpayment."

24    And fourth:

25         "The overall conduct of the

29

1    debtor's financial affairs."

2         Again, that's from *In re Feinberg*, 238 B.R. 783.  See

3    also *Crown Heights Jewish Committee Council v. Fischer*, 202

4    B.R. 341.

5              "Some courts, including one

6              bankruptcy court in the Western

7              District of Arkansas, have applied

8              a 50 percent standard in analyzing

9              the first two factors, finding

10             that a debtor is generally not

11             paying their debts when the unpaid

12             debts total more than 50 percent

13             of the debtor's total debt."

14        *In re Murrin*, 477 B.R. at 106, citing *In re Amanat*,

15   321 B.R. 30, and see also *In re J.B. Lovell Corp.,* 80 B.R.

16   254, and *In re Garland*, 67 B.R. 514, that's from the

17   bankruptcy court from the Western District of Arkansas in

18   1986.

19             "Although the test is one of

20             totality of the circumstances, and

21             there is no strict requirement for

22             a court to address each and every

23             factor, most courts addressing

24             this question rely heavily on the

25             number and amount of the unpaid

30

1          claims and compare those values

2          with the debts the debtor is

3          paying."

4      *In re Murrin*, 477 B.R. at 107, citing *In re Green*

5  *Hills Development Co., LLC*, 445 B.R. 647.  And that court

6  states:

7          "Without proof as to the number of

8          creditors and the amount of the

9          debt owed, the Court cannot

10          conclude that the alleged debtor

11          was generally not paying its

12          debts."

13      See also *In re Fischer*, 202 B.R. at 350, stating

14  that:

15          "The analysis requires a careful

16          balancing of both the number and

17          amount of the unpaid debts, in

18          proportional terms, viewed in the

19          light of the alleged debtor's

20          total financial picture."

21      And see also *In re Reed*, 11 B.R. 755, stating:

22          "Conducting a thorough analysis of

23          the number of creditors, amounts

24          owed, and payments made by the

25          debtor."

1    Here, GP put on evidence of two debts not being paid
2  by the alleged debtor as of the petition date; the debt to GP,
3  which the Court has found to be in bona fide dispute, and a
4  debt to Today's Bank with a balance of $618,862.82 as of the
5  trial date.  David Scruggs, President and CEO of Today's Bank,
6  testified to Today's Bank's claim against SQRL, a promissory
7  note dated July 6th, 2023, in the principal amount of 624,000
8  dollars, secured by a mortgage on certain property owned by
9  SQRL located in Paron, Arkansas.  However, the property that
10 SQRL had mortgaged to Today's Bank was transferred by
11 quitclaim deed from SQRL to Joseph -- to the Joseph Blake
12 Smith Irrevocable Trust on August 15th, 2023.  Scruggs
13 believed the purpose of the loan was to fund the construction
14 of a SQRL gas station in Paron, Arkansas, where the PAG was to
15 be installed.  Eddie Ramsey, who Scruggs understood to be
16 working for SQRL, approach -- approached Scruggs about
17 obtaining the loan.  The promissory note and mortgage appeared
18 to have been signed by Blake Smith and Adam Lusthaus; however,
19 Smith testified that the signatures on the promissory note and
20 mortgage were not his, and he further testified that he had no
21 knowledge of the loan when it was made, and that he had
22 advised Scruggs that he was not paying the loan for that
23 reason.  In any event, Scruggs testified that the date of the
24 last payment made on the loan was March 18th, 2024.  Although
25 Smith disputes SQRL's debt to Today's Bank, the Court need not

1   decide if that dispute is bona fide.  Today's Bank is not a

2   petitioning creditor.  And even if the Court found that this

3   debt was not in bona fide dispute, the Court has insufficient

4   evidence regarding the rest of SQRL's debt to determine if its

5   nonpayment of the debt to Today's Bank is significant in the

6   context of SQRL's overall debt load.

7          As alluded to earlier, in its discovery responses,

8   which were introduced as GP Exhibit 19, SQRL admitted that it

9   is the subject of lawsuits around the nation, but had asserted

10  that all of its debts are disputed, and that some debts in

11  question were assumed by Gas Hub when SQRL sold SQRL Service

12  Stations, LLC to Gas Hub in April of 2024.  GP did not prove

13  this asserted defense to be meritless, nor did it attempt to

14  do so at trial.  GP's debt is in bona fide dispute, so it

15  would be excluded from any analysis of whether the alleged

16  debtor was generally paying its debts as of the petition date,

17  leaving the Court with one debt to Today's Bank.  Based on the

18  record before the Court, which is bereft of evidence regarding

19  the total number of SQRL's debts and their amounts, the Court

20  cannot determine the alleged debtor's overall financial

21  condition, and cannot find that it was generally not paying

22  its debts as they were due, on the petition date.

23         While the Court has granted motions for relief from

24  stay for cause to pursue whatever debt may be owed in state

25  court, none of these creditors' debts were made part of the

33

1   record for this hearing, and, therefore, there was no

2   opportunity for the alleged debtor to cross examine as to

3   whether the debt -- those debts were subject to a bona fide

4   dispute.

5           In conclusion, for all of these reasons, the Courts

6   (sic) find that GP -- the Court finds that GP did not meet its

7   burden under Section 303 and dismisses the petition.

8           At this juncture, under subsection (i), this Court

9   could enter a judgment against the petitioner for various

10  things, and in favor of the alleged debtor, for costs or

11  attorney's fees, but I'm not going to do that here.  I don't

12  think the record supports it.  None of the issues were raised

13  at trial.  And there's just no record to base any amounts of

14  those costs or other items in that section.

15          There was no, also, argument or evidence entered into

16  the record, or even allegation made, as to any bad faith.  And

17  I don't believe the record would support that anyways.

18          This case was difficult, and the attorneys did a good

19  job, and they worked well together, which I always appreciate.

20          Mr. Lancaster, as the prevailing party, will you

21  please provide the Court with a proposed order?  You do not

22  have to type out everything I've said here today.  You may

23  incorporate the Court's findings of facts and conclusions of

24  law under Rule 7052.

25          MR. LANCASTER:  Thank you, Your Honor, I will do

34

1  that.

2          THE COURT:  Okay.  Thank you both.  I appreciate you

3  both.

4          At this time, we are going to let these parties move

5  out of the way, and I will call -- or not, you can stay there

6  -- but I'm done with the SQRL case, so we'll call the next

7  case.

8          MR. LANCASTER:  Your Honor, that's all I have.  May I

9  be excused?

10         THE COURT:  Yes.

11     (Adjournment at 10:06 a.m.)

12         <u>ELECTRONIC SOUND RECORDING CERTIFICATION</u>:

13 I, court approved transcriber, certify that the foregoing is a

14 correct transcript from the official electronic sound

15 recording of the proceedings in the above-entitled matter.

16

17 <u>/s/Robin Warbritton          </u>          <u>October 21, 2024          </u>
   Signature of Approved Transcriber     Date

18

19 <u>Robin Warbritton     </u>
   Typed or Printed Name

20

21

22

23

24

25